# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JUAN JORGE GUITRON, JR.,

      Plaintiff,

    **v.**                         **Case No. 18-CV-1072**

**OFFICER NOONAN, *et al.*,**

      Defendants.

---

## DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Juan Jorge Guitron, Jr., a Wisconsin state prisoner who is representing himself, filed this lawsuit under 42 U.S.C. § 1983. He asserts claims under the Eighth and Fourteenth Amendments against numerous correctional officers and sergeants and a lieutenant at the Outagamie County Jail. Both parties moved for summary judgment. For the reasons explained below, I will deny Guitron's motion for summary judgment and grant in part and deny in part the defendants' motion for summary judgment.

## BACKGROUND

*Procedural Background*

On October 3, 2018, I screened Guitron's complaint and allowed him to proceed on his claims against all defendants. (ECF No. 7.) I denied Guitron's motion to amend his statement of his claim (ECF No. 26) and later denied his motion for reconsideration of that order (ECF No. 27).

After several extensions of time, Guitron moved for summary judgment. (ECF No. 56.) The defendants also moved for summary judgment. (ECF No. 60.) The motions are fully briefed and before me for disposition.

*Factual background*

### *Parties*

The facts are taken from Guitron's proposed findings of fact (ECF No. 59), the defendants' response to his facts (ECF No. 67), the defendants' own proposed findings of fact (ECF No. 64), and Guitron's response to the defendants' facts (ECF No. 74). I will consider each party's proposed facts only to the extent they are supported by evidence in the record. See Fed. R. Civ. Pro. 56(c)(1); Civil L. R. 56(b)(1)(C)(i) and (2)(B)(i)–(ii). I will deem admitted any uncontroverted fact, see Civil L. R. 56(b)(4), and will consider arguments in the supporting memoranda only to the extent they properly refer to each party's statement of facts, see Civil L. R. 56(b)(6).

At all times relevant to his claims, Guitron was an inmate at the Outagamie County Jail ("Jail"). (ECF No. 64, ¶ 1.) He was incarcerated there from September 26, 2017, through February 7, 2019. (*Id.*, ¶ 2.)

Guitron sued several Correctional Officers: Officers Noonan, Muah, Strong, Sauer, Bloshenko, Voung, Xiong, Schattner, Nikolai, Navis, Orabutt, Meyer, Linjer, Voekner, Feucht, Van Offeran, Damman, Maki, Wells, Ravely, Morales, Hein, Skoleski, and Stadler. (ECF No. 64, ¶ 5.) He also sued Sergeants McVay, Edwards, Gardner, School, Wilson, and Rosenthal. (*Id.*, ¶ 4.) Finally, Guitron sued Lieutenant

Doug Verheyen. (*Id.*, ¶ 3.) All defendants worked at the Jail during the relevant time period. (*Id.*, ¶¶ 3–5.)

### *Guitron's Complaint*

Because Guitron's complaint is verified, I will consider the contentions in the complaint as I would in an affidavit for purposes of this decision. *See Devbrow v. Gallegos*, 735 F.3d 584, 587 (7th Cir. 2013); *Ford v. Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996).

Guitron filed his complaint on July 16, 2018, stating that each officer listed as a defendant slammed shut access doors in the Jail every forty-five minutes between 10:30pm and 6:00am every night from September 26, 2017, through June 28, 2018. (ECF No. 1 at 6.) He stated that the sergeants and Lieutenant Verheyen allowed the officers to slam the doors or let the doors close on their latches. (*Id.* at 7.) Guitron stated that the slamming doors disrupted his sleeping, and he could not make up the missed sleep during daytime hours because of frequent "standing counts" in the Jail conducted up to twelve times per day. (*Id.*) Guitron stated that he suffered migraines, sore eyes, fatigue, blurred vision, and emotional distress. (*Id.* at 8.) Although he did not name which officers specifically had slammed the doors in the Jail, he requested that Sergeant Wilson and Officers Noonan, Damman, Strong, and Skoleski be fired from their positions. (*Id.* at 9.)

### *Inmate Housing at the Jail*

While an inmate at the Jail, Guitron was housed in cells on the fourth and fifth floors. (ECF No. 64, ¶ 19.) Each of the housing units on those floors has inmate cells

3

lining one wall that open up into a shared day room. (*Id.*, ¶ 21.) Each individual cell has a sliding door that remains closed after lockdown each evening. (*Id.*, ¶ 23.) The housing units are two tiered, with a walkway running along the cells that allows access to the upper cells. (*Id.*, ¶ 25.)

In each housing unit there are inner doors on the upper and lower tiers that connect to the adjacent housing unit. (ECF No. 64, ¶ 26.) The defendants state that the inner doors were installed when the Jail was constructed. (*Id.*, ¶ 27.) Guitron disputes this fact but states that he does not know when the doors were installed. (ECF No. 74, ¶ 27.) He recalls installation of new doors on the fourth floor at some point while he was at the Jail and suggests (without citing evidence in the record) that the new doors may have been installed then. (*Id.*) Nonetheless, it is undisputed that the doors remain locked most times and are opened only when officers pass through them to account for inmates in their locked cells. (ECF No. 64, ¶ 28.)

The defendants contend that it is not possible to close the inner doors without creating some noise. (ECF No. 64, ¶ 29.) They also assert that there is some variation in the resistance of each locking mechanism on the upper doors, causing a similar variance in the amount of noise produced when each door is closed. (*Id.*, ¶ 30.) Guitron contests these assertions but states only that it is *quieter* (not silent) to manually guide the door closed and lock it. (ECF No. 74, ¶ 29.) He contends, again without citing to evidence, that the variance in locking mechanisms does not prevent the officers from quietly closing the doors. (*Id.*, ¶ 30.)

4

There also is a set of steel double doors forming the "sallyport" through which inmates and officers must pass to enter the hallway from a cell unit. (ECF No. 64, ¶¶ 31, 33.) One of the double doors remains closed when inmates are out of their cells. (*Id.*, ¶ 32.) Each door is a hollow, metal, security-grade door weighing approximately 255 pounds. (*Id.*, ¶ 34.) All locks on the doors are heavy-duty, security-grade locks, though the locks vary between mechanical and electrical operation. (*Id.*, ¶¶ 35–36.) The locks have heavy-duty springs to assure the latch snaps into place once the door is closed. (*Id.*, ¶ 37.) The locks also have several moving parts that click or snap into place to secure the bolt. (*Id.*, ¶ 38.)

The defendants state that the locks are designed to shut and lock on their own without human guidance. (ECF No. 64, ¶ 39.) Because the doors are heavy, they inevitably cause noise when they close against the door frame. (*Id.*, ¶ 40.) The defendants describe this as "normal noise caused by the security grade latches and heavy-duty latch springs . . . and is not caused by any officer intentionally attempting to slam doors." (*Id.*, ¶ 41.) Guitron, however, contends that the doors have the ability to shut and lock on their own but were not designed to allow officers to slam them shut, "creating an excessive amount of noise." (ECF No. 74, ¶ 39.) He blames officer use, and not the doors themselves, for creating the excessive noise of which he complains. (*Id.*, ¶¶ 40–41.) He asserts, again without evidentiary citation, that the doors can be engaged and disengaged manually, which would prevent the loud noise when the doors close. (*Id.*, ¶ 41.) He asserts that Officer Kapingst, who is not a

5

defendant in this lawsuit, always closes doors "quietly and effectively," proving it is possible not to close them loudly. (ECF No. 58, ¶ 22.)

### *Inmate Wellness Checks at the Jail*

Correctional officers at the Jail perform a "tour" of the units to conduct wellness checks of inmates every forty-five to fifty-five minutes. (ECF No. 64, ¶ 42.) According to the defendants, those tours comply with Wisconsin law, which requires jails to have a system in place for monitoring the well-being of inmates. (*Id.*, ¶ 43 (citing Wis. Admin. Code § DOC 350.18).) Under § DOC 350.18, Jail security must personally observe inmates, at most, once every sixty minutes. (*Id.*, ¶ 44.) The tours involve both inside check of inmates in their cells and welfare checks, which require inmates to stand to allow officers to verify that they are present in their cells and well. (*Id.*, ¶ 45.) The Jail conducts ten to twelve standing welfare checks each day on the fourth and fifth-floor units. (*Id.*, ¶ 46.) According to the defendants, the Jail staggers the welfare checks to allow inmates up to three one-and-a-half to two-hour periods between standing checks. (*Id.*, ¶ 47.) After each nightly lockdown, only inside, non-standing tours are conducted. (*Id.*, ¶ 48.) The defendants concede that in September 2017, when Guitron first entered the Jail, some officers performing the inside tours allowed the doors to close on their spring-loading, as they state the doors were designed to be closed and locked. (*Id.*, ¶ 49.)

Guitron asserts that between at least September 26, 2017, and November 18, 2017, standing welfare checks occurred twelve to twenty-two times per day. (ECF No. 74, ¶¶ 43, 46.) He asserts that the defendants "are hiding evidence" and that he

6

obtained information from "sending a request to Open Records and asking for the date that the standing counts went from around 22 to 12." (*Id.*, ¶ 46.) Guitron does not provide a copy of his request to Open Records or the response he received. He contends that the standing checks are not required under § DOC 350.18 to meet the requirement for welfare checks and that they were mandatory to receive meals, blankets, clothing, and hygiene items. (*Id.*, ¶¶ 45, 47.) He does not name any specific officers but broadly asserts that *all* officers allowed the doors to close loudly or intentionally slammed them shut when conducting inside tours. (*Id.*, ¶ 49.)

### *Guitron's Complaints, and the Jail's Response*

Between 2012 and 2018, there were at least eleven inmate complaints filed about slamming or loud doors. (ECF No. 64, ¶ 51.) The defendants assert that two of those grievances were filed in 2014; and the other nine, six of which are Guitron's, were filed in 2018. (*Id.*, ¶¶ 52–54.) Guitron points to an exhibit he submitted showing a complaint filed on July 31, 2015, complaining about "cell doors slamming at night" and another returned on January 28, 2015, about "Officers slamming inner doors at night." (ECF No. 74, ¶ 53; ECF No. 57-1 at 58, 64.) He also contests the defendants' count of grievances because, he asserts, he never received grievance logs showing the total number of grievances filed about the doors. (ECF No. 74, ¶¶ 53–54.)

Guitron filed his first grievance about the doors on March 28, 2018. (ECF No. 64, ¶ 55.) Sergeant Gardner denied the grievance, Guitron appealed, and Sergeant Wilson responded to the appeal. (*Id.*, ¶¶ 56–57; ECF No. 59, ¶¶ 8, 10.) Guitron states he also spoke with Officer Muah and Sergeant School about his

7

grievance but was unable to resolve it informally. (ECF No. 59, ¶¶ 5–6; ECF No. 58, ¶ 6.) Guitron also wrote to Verheyen to clarify that he did not believe all officers were intentionally slamming the doors and that his grievance was about the officers who "allow the doors to slam shut because of the spring loading when it could be prevented." (ECF No. 64, ¶ 59 (quoting ECF No. 62-2 at 2 (emphasis omitted)).) Verheyen denied the appeal but told Guitron that the Jail would "revise our training material to require that officers manually close the doors using only as much force is necessary and do not let them slam on their own during lockdown tours. Please be patient was (sic) we work through this process." (*Id.*, ¶ 58 (quoting ECF No. 62-1 at 1).)[1]

From April 17 to 22, 2018, the sergeant on duty instructed the officers at roll call to hold doors when closing them and not to allow them to close on their spring loading. (ECF No. 64, ¶ 63.) The same instructions were provided to officers who did not attend roll call. (*Id.*, ¶ 64.) Verheyen also emailed a video to night staff demonstrating the proper technique for closing the doors and later detailed the new door policy to all staff in a second email. (*Id.*, ¶¶ 65–66.) Nonetheless, Guitron asserts that he continued to hear the doors slamming. (ECF No. 74, ¶ 63.)

From June 26, 2018, through September 12, 2018, a sergeant or lieutenant randomly reviewed videos of tours to observe how officers were closing the doors. (ECF No. 64, ¶ 67.) No officer appeared to intentionally slam doors, though on

---

[1] Guitron also states that some inmates have filed grievances about "the excessive amount of standing counts." (ECF No. 59, ¶ 20.) But he does not specify whether he ever filed a complaint about the standing counts.

occasion an officer would allow a spring-loaded door to close on its own. (*Id.*, ¶¶ 68–69.) In such an instance, Jail administration would remind the officer about the proper door-closing technique. (*Id.*, ¶ 70.) In August 2018, Verheyen informed all officers of the policy changes and required them to acknowledge that they had received and read the changes. (*Id.*, ¶ 71.) Guitron continued to complain about some officers, and when he did a sergeant or lieutenant would review the specific tour complained of. (*Id.*, ¶¶ 72–73.) Although no officers were seen slamming doors, some continued to allow the doors to close on their spring-loading and were reminded of the proper door-closing procedure. (*Id.*, ¶¶ 74–76.) Guitron asserts that some officers continued slamming doors, but he does not name any specific officer or cite any evidence to support his contention. (ECF No. 74, ¶¶ 73–76.)

To ease Guitron's complaints, Jail staff thrice offered Guitron a move to the third-floor dormitory, which does not have inner doors or require standing welfare checks. (ECF No. 64, ¶¶ 77–78, 81, 85.) Guitron refused the move and asserts that he "wouldn't have lasted a week on the third floor." (*Id.*, ¶¶ 79, 81, 86; ECF No. 74, ¶ 79.) He stated that third-floor inmates had varying schedules; there would be too much "snoring, farting, talking, [and] yelling"; and he was concerned about losing "minimum status" because of his "history of bad conduct." (ECF No. 64, ¶ 80 (quoting ECF No. 61-2 at 10).) Guitron also refused an offer a move to the East side of the third floor, which has no inner doors and only four units, or to a single unit in 3 East. (*Id.*, ¶¶ 82–85.) The defendants assert that Guitron told Verheyen "that he was happy where he was at." (*Id.*, ¶ 86.) Guitron contests telling Verheyen he was "happy" where

9

he was and asserts that the East side of the third floor housed mentally ill inmates with whom he would not be safe. (ECF No. 74, ¶¶ 83, 86.)

Jail staff also offered Guitron free ear plugs to wear, which Guitron reported helped him some. (ECF No. 64, ¶ 87.) Guitron asserts, however, that the slamming doors still woke him, and he suffered an ear infection from constantly wearing the ear plugs. (ECF No. 74, ¶ 87.) Jail staff also offered to allow Guitron to participate in sleep studies in May and June 2018. (ECF No. 64, ¶ 88.) Guitron refused to participate in the May study and dropped out of the June study because, he asserts, participating in the study further deprived him of sleep. (*Id.*, ¶ 89; ECF No. 74, ¶ 89.)

On November 25, 2017, the Jail finalized revisions to its policies, informing officers on the fourth and fifth floors to "manually close the doors using only as much force is necessary and do not let them [s]lam on their own during lockdown hours." (ECF No. 64, ¶ 90 (quoting ECF No. 62-4 at 5).) On December 15, 2018, according to the defendants, the Jail modified policy SC 1.3.1, which relates to inmate housing unit doors, by adding section (c). (*Id.*, ¶ 91.) That new section instructs staff to minimize noise by not allowing "inner core doors to close on their own." (*Id.* (quoting ECF No. 62-5 at 2)) The documents the defendants submitted of policy SC 1.3.1 show section (c) was added, but Guitron quotes a response to one of his interrogatories in which the defendants stated that policy "SC 1.3.1 was not altered when SC 1 was revised on December 15, 2018." (ECF No. 74, ¶ 91 (quoting ECF No. 57-1 at 110).) He contends that the effective date was added in marker after he had a phone conference with counsel for the defendants. (*Id.*) Although some officers adhered to the new

10

policies, Guitron contends that many officers continued slamming doors for months. (ECF No. 64, ¶¶ 92–93; ECF No. 74, ¶ 92.)

### *Video Evidence*

Guitron also submitted DVDs that purportedly contain body-camera videos that he asserts support his position. (ECF No. 57.) He states that he obtained the videos from "Sergeant Hintze of Open Records" and believes that they "should show, to the best of [his] recollection," some of the defendant–officers slamming the doors. (ECF No. 58 ¶ 18; ECF No. 72 at 11.) He states that he previously viewed the videos on a laptop in the Jail, but "it had been a long time since I viewed them." (ECF No. 72 at 11.) He states that the videos were sent to the court "by a friend." (ECF No. 57-2.)

The defendants contest the admissibility of the videos. They assert that Guitron did not provide a copy of the DVDs to counsel for defendants, so they have been unable to view the videos. They also contend that Guitron failed to provide an affidavit from the source of the videos and does not describe the content of the videos, namely the date, time, or location of the videos or whose body camera was used to capture them. (ECF No. 65 at 11–12; ECF No. 75 at 2.)

I previously instructed Guitron on the proper procedure for laying a foundation for evidence, including the video evidence he has submitted to the court. (ECF No. 27 at 2, n.1.) Guitron did not follow that procedure for the video evidence in question here. Although he asserts that he has personally viewed the videos, he has not submitted with the videos an affidavit from the provider attesting to their contents, authenticity, or accuracy. He simply submitted the DVDs to the court and provided

11

what he believes, based on his recollection from an unspecified amount of time ago, appears in the videos.

Guitron also quizzically undercuts the usefulness of the videos. In contesting Verheyen's reliance on body-camera videos to determine whether officers were slamming doors, Guitron opines that "body-cam video is not effective" because "[t]he angle of the view can be manipulated and the microphone doesn't pick up sounds well from anyone or anything other than the officer wearing the camera. *The video evidence I submitted will show that.*" (ECF No. 74, ¶ 67 (emphasis added).) I have the same concerns about Guitron's videos, which he does not attest are accurate or useful in this litigation.

For these reasons, I will not consider the videos or their content for the purposes of this decision. *See Garcia v. Armor Corr. Health Serv., Inc.*, 788 F. App'x 393, 395–96 (7th Cir.), *rehearing and rehearing en banc denied* (Mar. 27, 2020) (quoting *United States v. Brewer*, 915 F.3d 408, 416 (7th Cir. 2019), and citing Fed. R. Evid. 901) (affirming district court's rejection of video evidence that lacked "'a foundation for its authenticity'" because "neither party submitted an affidavit identifying it").

## SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "[D]isputed facts that are not outcome-determinative are not material and will not preclude summary judgment." *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010).

To survive a motion for summary judgment, a non-moving party must show that sufficient evidence exists to allow a jury to return a verdict in its favor. *Brummett v. Sinclair Broad. Grp., Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## ANALYSIS

Because Guitron was a pretrial detainee at the time of the events, his claims are analyzed under the Fourteenth Amendment. *See Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019) (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). Under the Fourteenth Amendment standard, Guitron must show that that the defendants acted "with purposeful, knowing, or reckless disregard of the consequences" of their actions. *Miranda v. Cty. of Lake*, 900 F.3d 335, 354 (7th Cir. 2018). It is not enough to show they acted with negligence or even gross negligence. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cty.*,

13

909 F.3d 881, 886 (7th Cir. 2018)). Guitron also must show that the conditions of his confinement were objectively unreasonable; that is, he must show that the conditions were not "'rationally related to a legitimate non-punitive governmental purpose'" or that they were "'excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 822 (citing *Kingsley*, 135 S. Ct. at 2473). The court must "focus on the totality of facts and circumstances" that the defendants faced and "gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Williams*, 937 F.3d at 942.

The defendants contend that Guitron does not assert a proper Fourteenth Amendment claim because he does not provide evidence that the noise caused him injury or was "pervasive enough." (ECF No. 65 at 19.) The Court of Appeals for the Seventh Circuit has held that noise that occurs frequently every night and disrupts or prevents an inmate's sleep may violate the due process clause. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996); *see also Sanders v. Sheahan*, 198 F.3d 626, 628 (7th Cir. 1999) (holding that allegations of "excessive noise 24 hours a day" that "contributed to [inmate's] migraines" stated claim under due process clause). Guitron asserts that the noise from the slamming or closing doors was avoidable if officers manually guided doors closed instead of letting them shut on their own. He contends that the noise disrupted his sleep every night for months on end, even after he spoke with some officers about the noise and filed grievances about it. Under *Antonelli*, Guitron's claims may constitute a constitutional violation.

14

The defendants contend that the noise could not have been enough to violate Guitron's Fourteenth Amendment rights because there were not many other inmate complaints about the noise. (ECF No. 65 at 19–20.) But it is of no relevance whether *other* inmates were bothered by the noise. Guitron states in his sworn complaint and in his declaration that the noise was significant enough to disrupt his sleep every night. And he filed at least six inmate complaints about the noise. Those facts are sufficient to support Guitron's Fourteenth Amendment claims about the doors.

Guitron does not assert that the standing welfare checks, on their own, violated his due-process rights. Nor could he, for those checks were conducted to comply with Wis. Admin. Code § DOC 350.18 and were therefore "rationally related to a legitimate non-punitive governmental purpose." *Hardeman*, 933 F.3d at 822. He instead asserts that the standing welfare checks worsened his sleep deprivation because they prevented him from sleeping during the day to make up for his disrupted nighttime sleeping.

*Claims Against the Officers*

Guitron's brief and facts frame his claims as against the officers collectively. To establish liability under § 1983, however, "[t]he plaintiff must demonstrate a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). Although Guitron argues that each officer was involved, "argument alone is insufficient to avoid summary judgment." *Cooper v. Haw*, --- Fed. App'x ----, No. 19-1661, 2020 WL 1231417, at *2 (7th Cir. Mar. 13, 2020). Guitron instead must "come forward with *evidence*" showing

15

how each officer disrupted his sleep that would be sufficient to "support a jury's verdict in [his] favor" against each officer. *See Beatty v. Olin Corp.*, 693 F.3d 750, 754 (7th Cir. 2012) (emphasis in original); *Van Diest Supply Co. v. Shelby County State Bank*, 425 F.3d 437, 439 (7th Cir. 2005); *see also Hoeft v. Kasten*, 691 F. Supp. 2d 927, 931 (W.D. Wis.), *aff'd*, 393 F. App'x 394 (7th Cir. 2010) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)) ("Although plaintiff provided sufficient *allegations* in his complaint to state an Eighth Amendment conditions of confinement claim, he has failed to produce sufficient *evidence* to defeat defendant's summary judgment motion on that claim.").

In his brief, facts, and declaration in support of his motion for summary judgment, Guitron specifically names only Officers Muah, Xiong, Strong, Maki, and Stadler as having disrupted his sleep. (ECF No. 58, ¶¶ 6, 18–20; ECF No. 59, ¶ 5; *see also* ECF No. 74, ¶ 59.) He does not mention any other officer by name in those materials. The only document in which he cites to evidence in the record is in his declaration (ECF No. 58), and even then he only generally cites exhibits without specifying where the exhibit shows certain defendants or their actions that violated his rights. Guitron may be a *pro se* litigant, but it is not the court's job "'to scour the record looking for factual disputes.'" *D.Z. v. Buell*, 796 F.3d 749, 756 (quoting *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995)).

Guitron states that he attempted, unsuccessfully, to resolve his grievance with Officer Muah. (ECF No. 58, ¶ 6.; ECF No. 59, ¶ 5.) Prison officials may not be held liable for doing their jobs and denying an inmate complaint. *See Burks v. Raemisch*,

16

555 F.3d 592, 595 (7th Cir. 2009). There may be a constitutional violation only if the official has refused to do his or her job and thereby shown deliberate indifference towards the prisoner's dilemma. *Id.* Guitron does not assert that Muah improperly handled or denied his grievance. He states only that he was unable to resolve his grievance with Muah informally. Because Guitron fails to provide evidence that Muah acted unreasonably or recklessly, summary judgment is appropriate for Officer Muah.

Guitron asserts that Officer Xiong slammed shut a door using both of his hands and that another inmate asked Xiong not to. (ECF No. 74, ¶ 59.) That other inmate submitted an affidavit stating the same. (ECF No. 57-1 at 77–78.) But Guitron does not state that Xiong's actions were repeated or, more importantly, that they affected *his* sleep. He states only that another inmate complained about Xiong's actions. Nor does Guitron state whether this occurred after he had complained and filed his grievance about the slamming doors or after the new policy had been created to instruct the officers to guide the doors closed. Even if Xiong slammed a door on one occasion, Guitron fails to provide evidence showing he did so with reckless disregard for Guitron or the Jail's policies against slamming doors. Summary judgment is appropriate for Officer Xiong.

Guitron states in his declaration that Strong allowed doors to slam at night and told Guitron "if you don't like it then don't come to jail!" (ECF No. 58, ¶ 18.) Guitron attached a declaration from another inmate who bolsters this account. (ECF No. 57-1 at 72.) Guitron also attached a declaration from a third inmate who asked

17

Strong not to slam the doors, to which Strong replied, "You [sic] lucky I didn't slam it harder." (ECF No. 57-1 at 68.) Guitron asserts that Officer Maki similarly said "I could give a damn" in response to Guitron's complaint about Maki slamming doors. (ECF No. 58, ¶ 19.) Another inmate attests to the same. (ECF No. 57-1 at 70.) This evidence shows a dispute of material fact whether Officers Strong and Maki deliberately disregarded the consequences of their actions and acted unreasonably by repeatedly slamming shut the doors. Summary judgment is therefore inappropriate for Officers Strong and Maki.

Guitron asserts that Officer Stadler woke him up for one of the sleep studies in which Guitron chose to participate. (ECF No. 58, ¶ 20.) He does not contend that Stadler repeatedly woke him by slamming doors, the issue on which Guitron is proceeding in this case. Waking Guitron on one occasion, and not by slamming or closing doors but as part of a voluntary sleep study, may have been obnoxious, but it does not show that Stadler acted unreasonably or disregarded Guitron's well-being or need for sleep. Stadler is entitled to judgment as a matter of law.

Guitron points to no evidence, not even in his complaint or his declaration, that any officer other than those specifically discussed above slammed doors or allowed them to close loudly and repeatedly disrupted Guitron's sleep. Without evidence of each officer's involvement in the violation of his rights, a jury could not return a verdict in Guitron's favor against those officers. Summary judgment is therefore appropriate against the remaining officers.

*Claims Against Sergeants and Verheyen*

18

Guitron cannot hold Verheyen and the sergeants liable merely because of their supervisory positions. Under § 1983, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* To be held liable under 42 U.S.C. § 1983, the supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001).

Guitron discusses specific actions by Sergeants Gardner, School, Wilson, and Rosenthal. He states that he spoke with School and Rosenthal about the slamming doors but was unable to reach a resolution. Sergeant Gardner denied the grievance after Guitron filed it, and Sergeant Wilson recorded the appeal of his denied grievance. As discussed above, jail officials are not liable for denying Guitron's grievances unless they did so improperly. *See Burks*, 555 F.3d at 595. Guitron does not assert that the sergeants improperly handled his grievance or appeal. The sergeants, therefore, may not be held liable for doing their jobs.

Guitron also states that Wilson "harassed" him with sarcastic remarks about Guitron's complaints. (ECF No. 58, ¶ 24; ECF No. 57-1 at 93.) Simple verbal harassment, however, does not amount to a constitutional violation. *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000), *abrogated in part on different grounds by Savory v. Cannon*, 947 F.3d 409, 423–24 (7th Cir. 2020) (en banc).

19

Guitron does not assert misconduct by Sergeants Edwards or McVay, nor does he point to any evidence that would support a claim against either sergeant. These sergeants are entitled to summary judgment.

Finally, Guitron may not proceed against Lieutenant Verheyen. Guitron states that he notified Verheyen by April 2018 of the noise from the slamming or closing doors. In response, Verheyen issued several changes to the Jail's policy and instructed all officers to guide the doors closed instead of slamming them or allowing them to close on their own. He and other sergeants routinely viewed videos of officers during the night and corrected the behavior of officers who continued to allow the doors to close on their own. There is no evidence that Verheyen disregarded Guitron's concerns and complaints about the noise or turned a blind eye to the improper actions of his officers. On the contrary, the undisputed facts show that Verheyen took several reasonable actions to attempt to abate the noise. Lieutenant Verheyen is entitled to judgment as a matter of law.

*Eighth Amendment*

Guitron was convicted and sentenced on January 10, 2019, but he remained in the Jail until about a month later. (ECF No. 64, ¶ 2, 98.) To the extent Guitron's claims may arise under the Eighth Amendment, summary judgment is appropriate for the same reasons discussed above. An Eighth Amendment claim consists of both objective and subjective components. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, a prisoner must show that he "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The subjective

component of an Eighth Amendment violation requires a prisoner to demonstrate that the official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." *Id.* A prison official shows deliberate indifference when he "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 837). The conditions of a prisoner's confinement may be considered cruel and unusual when they deprive inmates of "the minimal civilized measure of life's necessities as measured by a contemporary standard of decency." *Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *see Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976).

Guitron's claims about the slamming doors that disrupted his sleep every night satisfy the objective component of an Eighth Amendment claim. *See Antonelli*, 81 F.3d at 1433. But for the reasons discussed above, they fail to satisfy the subjective component. Guitron fails to provide evidence that most defendants were aware of the disruption Guitron experienced yet disregarded the condition and continued to slam the doors or allow them to close loudly. Nor he does he point to evidence that any defendant continued to slam or close doors between the time he was sentenced in January 2019 and a month later when he was transferred out of the Jail. Because he cannot satisfy the subjective component against any defendant, the defendants are entitled to summary judgment on Guitron's Eighth Amendment claims against them.

*Qualified Immunity*

The defendants contend that the claims against them also must be dismissed under the doctrine of qualified immunity. (ECF No. 65 at 27.) Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). Qualified immunity is an affirmative defense. Once raised, the plaintiff must show that the defendants violated his constitutional right and that the right at issue was clearly established at the time of the violation. *Pearson*, 555 U.S. at 232. The law is "clearly established" only if "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Figgs*, 829 F.3d at 905 (quoting *Campbell v. Peters*, 256 F.3d 695, 701 (7th Cir. 2001)) (internal quotation marks omitted). "The clearly established law must be 'particularized' to the facts of the case.'" *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). It is not necessary that there be cases "directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 551 (internal quotation marks omitted).

As discussed above, the law in this circuit since at least 1996 has been that disruptive noise that occurs every night over an extended period of time and prevents a pretrial detainee from sleeping may constitute a violation of his rights. *See Sanders*,

22

198 F.3d 628; *Antonelli*, 81 F.3d at 1433. And Guitron has provided evidence that two of the officers (Strong and Maki) knew about Guitron's complaints yet disregarded them and continued to act unreasonably and without legitimate penological justification. Those officers are not entitled to qualified immunity.

## ORDER

**IT IS THEREFORE ORDERED** that plaintiff Juan Jorge Guitron's motion for summary judgment (ECF No. 56) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 60) is **GRANTED in part and DENIED in part**. Guitron may proceed on his claims against Officers Strong and Maki. All other claims and defendants are **DISMISSED**.

I will enter a separate order scheduling a status conference with the remaining parties to discuss the next steps.

Dated in Milwaukee, Wisconsin, this 20th day of August, 2020.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge